**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

GARNETT ROAD BAPTIST CHURCH,    )
                                                )
            Plaintiff,                )
                                                )
v.                                             )       Case No. 19-CV-00286-GKF-JFJ
                                                )
GUIDEONE MUTUAL INSURANCE     )
COMPANY,                             )
                                             )
            Defendant.            )

## OPINION AND ORDER

This matter comes before the court on the Motion for Summary Judgment [Doc. 38] of defendant GuideOne Mutual Insurance Company. For the reasons set forth below, the motion is granted in part, moot in part, and denied in part. The motion is granted as to plaintiff Garnett Road Baptist Church's breach of contract claim to the extent premised on failure to pay depreciation and failure to pay for water intrusion, if any, to the Hmong Church Building. The motion is moot insofar as it seeks judgment for breach of contract premised on failure to pay sales tax. The motion is otherwise denied.

### I.      Factual Background

The following facts are undisputed for purposes of the summary judgment determination.

Defendant GuideOne Mutual Insurance Company (GuideOne) issued a Commercial Policy, designated policy no. 1438-700 (Policy), to plaintiff Garnett Road Baptist Church (the Church). [Doc. 38-1; Doc. 40-3]. The Policy was effective June 15, 2016, and renewed effective

June 15, 2017.  [Doc. 40-3, p. 4; Doc. 38-3, p. 9].[1]  The Policy's Commercial Property Coverage

Part Declarations Page identifies 620 S. Garnett Road, Tulsa, Oklahoma 74128 (Property) as the

insured premises.  [Doc. 38-1, pp. 3-4].  The Property consists of four separate buildings:  (1)

Sanctuary; (2) Classroom Building; (3) Early Learning Center; and (4) Hmong Church Building.

The Policy contains the following provisions:

**BUILDING AND PERSONAL PROPERTY COVERAGE FORM**

A.    COVERAGE

We will pay for direct physical loss of or damage to Covered Property at
the premises described in the Declarations caused by or resulting from any
Covered Cause of Loss.

\*\*\*

E.    LOSS CONDITIONS

The following conditions apply in addition to the Common Policy
Conditions and the Commercial Property Conditions.

\*\*\*

7.    VALUATION

We will determine the value of Covered Property in the event of loss
or damage as follows:

a.    At replacement cost (without deduction for depreciation),
except as provided in **g., h., i.**, and **j.** below.

\*\*\*

d.    We will not pay on a replacement cost basis for any loss or
damage:

---

[1] Although not directly set forth by the parties, based on the evidence submitted, it is clear the
Policy's original effective date was June 15, 2016, and that the Policy was renewed effective June
15, 2017.  [Doc. 40-3, p. 4; Doc. 38-3, p. 9].  There appears to be no dispute that the relevant Policy
provisions were identical in each Policy period.

(1)     Until the lost or damaged property is actually repaired or replaced; and

(2)     Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage.

\*\*\*

## CAUSES OF LOSS – SPECIAL FORM

A.     COVERED CAUSES OF LOSS

When Special is shown in the Declarations, Covered Causes of Loss means Risks Of Direct Physical Loss unless the loss is:

1.     Excluded in Section **B.**, Exclusions; or

2.     Limited in Section **C.**, Limitations; that follow.

\*\*\*

B.     EXCLUSIONS

\*\*\*

2.     We will not pay for loss or damage caused by or resulting from any of the following:

d.     (1) Wear and tear;

(2)     Rust or other corrosion, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself;

\*\*\*

(4)     Settling, cracking, shrinking or expansion;

\*\*\*

3.     We will not pay for loss or damage caused by or resulting from any of the following, **3.a.** through **3.c.**  But if an excluded cause of loss that is listed in **3.a.** through **3.c.** results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

\*\*\*

    c.    Faulty, inadequate or defective:

        \*\*\*

      (2)    Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

          \*\*\*

      (4)    Maintenance;

    of part or all of any property on or off the described premises.

        \*\*\*

C.    LIMITATIONS

The following limitations apply to all policy forms and endorsements, unless otherwise stated.

1.    We will not pay for loss of or damage to property, as described and limited in this section.  In addition, we will not pay for any loss that is a consequence of loss or damage as described and limited in this section.

        \*\*\*

    c.    The interior of any building or structure, or to personal property in the building or structure, caused by or resulting from rain, snow, sleet, ice, sand or dust, whether driven by wind or not, unless:

      (1)    The building or structure first sustains damage by a Covered Cause of Loss to its roof or walls through which the rain, snow, sleet, ice, sand or dust enters; or

      (2)    The loss or damage is caused by or results from thawing of snow, sleet or ice on the building or structure.

[Doc. 38, pp. 6-7, ¶ 1; Doc. 40, p. 5, ¶ 1; Doc. 38-1, pp. 7, 26, 29, 37, 39, 41-43].

On April 19, 2018, the Church made a claim for storm damage to the church's roof.  [Doc. 38, p. 7, ¶ 2; Doc. 40, p. 5, ¶ 2].  Immediately following notice of the claim, GuideOne adjuster Denis Dufrenne contacted the Church to discuss the loss, deductible, and claims process, and to advise that an independent adjuster would be on-site Wednesday, April 25, to perform an inspection.  During the discussion, Dufrenne was advised that hail had moved through the area in November 2017, but that the Property's roof had been recently inspected and hail damage discovered.  [Doc. 38, p. 7, ¶ 3; Doc. 40, p. 5, ¶ 3].

Dufrenne retained U.S. Adjusting to perform an inspection of the Property, and U.S. Adjusting assigned Independent Adjuster John Chapman.  Chapman inspected the four buildings at the Property over the course of multiple days.  [Doc. 38, pp. 7-8, ¶ 4; Doc. 40, p. 5, ¶ 4].  At the close of the inspection, Chapman recommended that GuideOne retain an engineer.  [Doc. 38-3, p. 8; Doc. 38-4].

Dufrenne retained engineering firm EFI Global to inspect the Property.  EFI Global assigned engineer Chad Williams to the claim.  [Doc. 38, pp. 8-9, ¶ 6; Doc. 40, p. 6, ¶ 6; Doc. 38-3, p. 8].  Williams inspected the Property on May 18, 2018 and submitted a report to GuideOne on May 30, 2018.  Based on Williams' report, GuideOne concluded that the damages occurred prior to the Policy's inception and, further, that exclusions and limitations of coverage for interior water damage unless the roof or walls of the building first sustain damage from a covered cause of loss applied.  [Doc. 38, pp. 8-9, ¶ 6; Doc. 40, p. 6, ¶ 6; Doc. 38-6].

On September 25, 2018, GuideOne received correspondence from church member and Vice Chairman of Deacons Kurt Gariss.  [Doc. 38, pp. 9-10, ¶ 8; Doc. 40, p. 6, ¶ 8; Doc. 38-7; Doc. 38-8].  The correspondence included bullet pointed criticism of Williams's report and GuideOne's denial, and requested coverage for the roof damage.  [Doc. 38, pp. 9-10, ¶ 8; Doc. 40,

p. 6, ¶ 8; Doc. 38-8, pp. 4-5].  Dufrenne reviewed the correspondence.  On October 1, 2018, Dufrenne advised the Church that "we have differences of opinion regarding the inspection" and referred the Church to the Policy's Appraisal Clause.  [Doc. 38, pp. 9-10, ¶ 8; Doc. 40, p. 6, ¶ 8; Doc. 38-10].

GuideOne offers no evidence of further activity with respect to the claim until March 1, 2019.  On March 1, public adjuster Brianna Case of Sky Diamond Adjusting (Sky Diamond) notified GuideOne of its representation of the Church.  [Doc. 38, p. 10, ¶ 9; Doc. 40, p. 6, ¶ 9].  GuideOne reopened plaintiff's claim and assigned it to adjuster Tom Harrington for handling and to Lonnie Sherry for reinspection with Sky Diamond.  [Doc. 38, pp. 10, ¶ 9; Doc. 40, p. 6, ¶ 9].

On April 8, 2019, GuideOne received a report from Kelly Parker, P.E. of Smart House Consultants, on behalf of the Church.  [Doc. 38, p. 10, ¶ 10; Doc. 40, p. 6, ¶ 10; Doc. 38-12].  Parker opined that the most probable date of loss was April 4, 2017.  [Doc. 38, p. 10, ¶ 10; Doc. 40, p. 6, ¶ 10; Doc. 38-12, p.  6].

On September 17, 2019, GuideOne retained RMC Group, LLC to provide an estimate of the loss for hail damage.  [Doc. 38, p. 10, ¶ 12; Doc. 40, p. 6, ¶ 12].  RMC assigned the claim to Jared Verstraete, who inspected the Property on October 15, 2019.  Verstraete inspected both the Property's exterior and interior.  [Doc. 38, pp. 10-11, ¶ 13; Doc. 40, p. 6, ¶ 13].

On December 3, 2019, Verstraete provided GuideOne an estimate limited to exterior repairs at the Property.  Verstraete estimated a RCV cost for exterior repair of $197,900.28 and ACV cost of $158,725.22.  That same day, Harrington spoke with Verstraete about the interior water damage at the Property and EFI's prior report, prepared by Williams.  It was determined that EFI would assign an engineer to inspect the Property with respect to interior water intrusion.  [*Id.*].

On December 12, 2019, GuideOne issued a settlement check in the amount of $153,725.22 for the net ACV payment for exterior roofing repairs.  [*Id.*; Doc. 40-5].  The breakdown of the payment was as follows:

> Total Roof Repair Cost:  $197,900.28
>
> Less Depreciation:  $39,175.06
>
> Less Deductible:  $5,000.00
>
> Net Payment:  $153,725.22

[Doc. 40-5, pp. 1-2].

EFI assigned the interior water intrusion portion of the claim to Stanton Smith, who inspected the Property on December 10, 2019.  [Doc. 38, pp. 11, ¶ 14; Doc. 40, p. 7, ¶ 14].  On February 12, 2020, GuideOne received Smith's report, which was limited to three buildings:  (1) the Sanctuary; (2) the Early Learning Center; and (3) Classroom Building.  Smith opined that the water intrusion in the buildings was not due to hail, but was caused by sources including loose flashing, loose nails, loose screws, loose decking, loose ridge caps, cracked sealant, failed plumbing vent gaskets and missing and folded shingle tabs.  [Doc. 38, pp. 11, ¶ 14; Doc. 40, p. 7, ¶ 14; Doc. 38-15].  Based on Smith's findings, in March 3, 2020 correspondence, GuideOne denied coverage for the interior water intrusion damages.  [Doc. 38, pp. 11, ¶ 14; Doc. 40, p. 7, ¶ 14; Doc. 38-16].

On April 4, 2019, the Church filed a Petition in the District Court in and for Tulsa County, Oklahoma.  The Petition includes claims for breach of contract and breach of the duty of good faith and fair dealing.  [Doc. 2-1].  GuideOne removed the case to this court pursuant to diversity jurisdiction, 28 U.S.C. § 1332.  [Doc. 2].

GuideOne now seeks summary judgment in its favor as to the Church's claims, as well as plaintiff's request for punitive damages.  [Doc. 38]. The Church filed a response [Doc. 40], and GuideOne filed a reply [Doc. 48].  Thus, the motion for summary judgment is ripe for the court's review.

## II.      Summary Judgment Standard

Pursuant to Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*  "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*  Further, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).  However, "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249.

A court must examine the factual record in the light most favorable to the party opposing summary judgment.  *Wolf v. Prudential Ins. Co. of Am.*, 50 F.3d 793, 796 (10th Cir. 1995). Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Id.* (quoting Fed. R. Civ. P. 56(c)).

### III.    Analysis

GuideOne seeks summary judgment as to the Church's breach of contract and bad faith claims, as well as the Church's request for punitive damages.  The court first considers breach of contract.

*A.    Breach of Contract Claim*

In Oklahoma, general principles of contractual interpretation govern the construction of an insurance policy.  *Dodson v. St. Paul Ins. Co.*, 812 P.2d 372, 376 (Okla. 1991).[2]  Under Oklahoma law, the elements of a breach of contract claim are: "(1) the formation of a contract, (2) breach of the contract, and (3) damages as a result of that breach."  *Cates v. Integris Health, Inc.*, 412 P.3d 98, 103 (Okla. 2018).  GuideOne asserts it is entitled to summary judgment on the Church's breach of contract claim for two separate reasons:  (1) the Church is not entitled to contractor's overhead and profit and/or sales tax with respect to the exterior roof damage because it is not reasonably likely to incur those costs; and (2) the Church is not entitled to coverage for the interior water damage because there was no storm created opening.  In response, the Church argues that a genuine dispute of fact exists as to those issues and, further, that GuideOne breached the insurance contract for the additional reason that it failed to pay depreciation with respect to the exterior roof damage.  The court separately considers each contention.

---

[2] Although not stipulated by the parties, the parties do not dispute that Oklahoma law governs the interpretation of the Policy.

1.      Overhead and Profit[3]

Although it does not appear that Oklahoma courts have directly addressed the issue, courts in other jurisdictions generally conclude that general contractor overhead and profit are included in the scope of policy benefits "where the insured is *reasonably likely* to need a general contractor for repairs." *Trinidad v. Fla. Peninsula Ins. Co*., 121 So. 3d 433, 438 (Fla. 2013) (emphasis added); *see also Ghoman v. New Hampshire Ins. Co.,* No. 01-CV-0092-BDL, 2001 WL 1112535, at *5 (N.D. Tex. Sept. 6, 2001).

In the motion, GuideOne recognizes that Case, the Church's public adjuster, testified that a general contractor would be reasonably required to replace the roof because the work involved two to three different styles of roofing, HVAC and plumbing would need to be moved, and the work would need to be coordinated with the church.  [Doc. 38-18, p. 2].  However, GuideOne argues that Case's testimony is "incorrect" because Lewis Roofing, a company retained by the Church to estimate the cost of the exterior roof repair, did not include a charge for a general contractor.  [Doc. 38 at pp. 14-15].  GuideOne further urges the court to disregard Case's testimony as "inherently unreliable as she testified she will receive a 10% contingency fee on the total amount of the claim, and thus has a direct, personal financial interest in increasing the total amount of the claim."  [Doc. 38, p. 14 n.1].

GuideOne's objections to Case's testimony bear on the weight and credibility of the evidence.  As previously stated, this court may not weigh evidence or make credibility determinations at the summary judgment stage. *See Sanders v. Sw. Bell Tel., L.P.,* 544 F.3d 1101,

---

[3] As previously stated, GuideOne also seeks summary judgment as to the Church's claim for sales tax.  In its response brief, the Church states that it does not seek recovery of sales tax.  [Doc. 40, p. 17 n.4].  Thus, this issue is moot.

1105-06 (10th Cir. 2008).   Thus, a genuine issue of material fact exists as to whether it was reasonably likely that the Church would require a general contractor for the exterior roof repairs. GuideOne is not entitled to summary judgment as to the Church's breach of contract claim on this issue.

2.   <u>Interior Water Intrusion</u>

GuideOne next argues that the claimed damages for interior water intrusion are not covered under the Policy because the water did not enter the structures through openings created by a Covered Cause of Loss—*i.e.,* wind or hail.

The parties' briefs are directed to the interior water intrusion claim as a whole.   However, for ease of analysis, the court separately considers the argument and evidence directed to each building.[4]

First, with respect to the Early Learning Center, both Smith and Berryman opine that the water intrusion was not due to wind or hail.   [Doc. 38-15, p. 4; Doc. 38-17, pp. 21-22].   However, Parker, the Church's expert, opines

> [t]he roof penetrations consist of PVC vent pipes with rubber boot jacks surrounding the PVC vent pipe. . . .   The hail event of April 2017 produced significant sized hail which impacted these vent jack rubber boots to flex the rubber boots enough and cause splits around the vent boots and allow water infiltration into the interior.

[Doc. 40-6, p. 7].   Thus, a genuine dispute of fact exists as to the cause of the water intrusion in the Early Learning Center and therefore coverage for the damage under the Policy.

---

[4] In reply, GuideOne appears to concede that some parsing is necessary as it states:  "A close review of the expert reports in this matter, demonstrates that while disagreements as to water damage in certain areas exists, **not all the interior water damage is disputed by Plaintiff's expert**."  [Doc. 48, p. 1 (emphasis in original)].

Likewise, based on the parties' respective expert reports, a dispute of fact exists as to the cause of the water intrusion in the Classroom Building. *Compare* [Doc. 38-15, p. 4; Doc. 38-17, pp. 21-22] *with* [Doc. 38-22, p. 7 ("It is my professional opinion the water entry into the roof is due to deteriorated rubber vent boot jacks being impacted by hail causing splits and cracks in the vent boots thus allowing water entry into the interior.")].

A closer issue exists with respect to the water intrusion in the Sanctuary, the damage to which the parties primarily direct their argument. GuideOne again points the court to the opinions of Smith and Berryman. In his February 11, 2020 report, Smith first referred to Conclusion 4 in Williams' May 30, 2018 report that the water intrusions along the east peak of the Sanctuary were consistent with water seeping in at the flashing between the brick veneers/metal wall panels and the roof surfaces. Smith stated that his own observations supported Williams' conclusion. [Doc. 38-15, p. 4]. Smith further opined that the water intrusion resulted from "loose flashing, loose nails, loose screws, loose decking, loose ridge caps, cracked sealant, failed plumbing vent gaskets and missing and folded shingle tabs." [*Id.*]. Similarly, Berryman opined that "the observed interior water damage in the Sanctuary corresponded with deteriorated plumbing pipe flashings, asphalt shingle-to-modified bitumen transition flashing and flashing at and about the church steeple" and that "[e]vidence reveals these water intrusion avenues are the result of wear, tear and maintenance issues that were known to church maintenance personnel or should have been discovered and addressed as part of routine and expected efforts to maintain the structure's water tightness." [Doc. 38-17, p. 22].

Further, GuideOne argues that Parker's opinions are not inconsistent and, in fact, support Berryman's findings. *See* [Doc. 38, p. 18]. Specifically, GuideOne points to Parker's statements that "[t]he interior damage of the Sanctuary has been an ongoing problem for at least 5 years and

is due to old flashings and steeple connection issues," and, further, "[i]t is now difficult to find hail impacted flashings . . . as the Church has installed white elastromeric sealant and asphaltic black sealant around the flashings and the roof around the steeple.  This has covered up any potential hail marks due to hail impacts from 2017."  [Doc. 38, p. 19 (citing Doc. 38-22, p. 6)].  GuideOne contends that any opinion by Parker that *hail* affected the flashing is too speculative and conclusory to create a genuine dispute of fact.

Parker's assertion that hail impacts damaged the flashings near the steeple is not wholly unsupported, as Parker identified one circular perforation typical of hail to previously sealed areas. *See* [Doc. 38-22, p. 17 (photo 17)].  Further, Parker opined that "holes in the *rubber boot* flashings became larger as the boot flashing was damaged by hail," and that the "hail impacted flashing damage (*rubber boots*) from 2017 . . . has exacerbated an ongoing leakage issue in the sanctuary (segregation is not possible this far removed from the event)."  [*Id.* at p. 6 (emphasis added)].[5]

Viewing the evidence in the light most favorable to non-movant the Church, as the court must, the Church has presented minimally sufficient facts from which reasonable jurors could conclude that the interior water intrusion in the Sanctuary resulted from entry of water through a storm created opening.  A genuine dispute of fact therefore exists as to whether GuideOne breached the Policy by denying coverage for the damage.[6]  GuideOne is not entitled to summary judgment

---

[5] Insofar as GuideOne argues that Parker's conclusions are refuted by Berryman, the court can neither weigh the evidence nor determine the truth of the matter.  *Anderson,* 477 U.S. at 249.

[6] As for the fourth and final building, the Hmong Church Building, it is unclear whether the Church has asserted a claim for water intrusion to that building.  To the extent that the Church has made a claim under the Policy for water intrusion in the Hmong Church Building, GuideOne is entitled to summary judgment.  Berryman opined that there were no storm created openings in the roof that would allow water intrusion/damage into the interior [Doc. 38-17, p. 21], and the Church offers no evidence to the contrary.

as to the Church's breach of contract claim premised on damages for interior water intrusion.  The parties may argue to the jury whether specific or localized areas of water intrusion resulted from entry of water through openings created by a Covered Cause of Loss.

       3.     <u>Depreciation</u>

As previously stated, in its response to GuideOne's motion, the Church argues that GuideOne breached the insurance contract for the additional reason that it has not paid the Church recoverable depreciation totaling $39,175.06.  *See* [Doc. 40-5].

Pursuant to the Policy, GuideOne will not pay on a replacement cost basis (without deduction for depreciation) until the lost or damaged property is actually repaired and replaced and unless the repairs or replacement are made as soon as reasonably possible after the loss or damage.  [Doc. 40-3, p. 51].  The Church argues that GuideOne's denial of its claim on June 4, 2018—and asserted breach of contract—excused any subsequent performance by the Church, including the obligation to repair and replace, pursuant to the doctrine of prior material breach.

"The 'prior material breach' doctrine . . . applies when a contract contemplates an exchange of performances between the parties, and holds that one party's failure to perform allows the other party to cease its own performance."  *Winn & Assocs., PLLC v. EmCare Physician Providers, Inc.,* No. 13-CV-00427-JHP, 2014 WL 3573443, at *6 (E.D. Okla. July 21, 2014) (emphasis altered from original).  However, the Church directs the court to no Oklahoma authority applying the doctrine in the context of an insurance contract.  Other courts have declined to apply the doctrine under similar circumstances, instead, concluding that the plain language of the insurance contract controls.  *See, e.g., Kaw Drive, LLC v. Secura Ins*., No. 19-2238-JWL, 2020 WL 6084025, at *2 (D. Kan. Oct. 15, 2020); *Cook v. USAA Cas. Ins. Co*., No. 16-CV-00207-JCN, 2020 WL 556394, at *9 (D. Me. Feb. 4, 2020).

The Oklahoma Supreme Court has directed courts to apply the "ordinary, plain meaning" of unambiguous policy provisions, *BP Am., Inc. v. State Auto Prop. & Cas. Ins. Co.*, 148 P.3d 832, 835 (Okla. 2005), and the rule is binding on the court in this case. *See Wade v. EMCASCO Ins. Co.,* 483 F.3d 657, 665-66 (10th Cir. 2007) (internal citations and quotations omitted) ("In cases arising under diversity jurisdiction, the federal court's task is not to reach its own judgment regarding the substance of the common law, but simply to ascertain and apply the state law. The federal court must follow the most recent decisions of the state's highest court."). Pursuant to the Policy's plain language, GuideOne was not obligated to pay depreciation until the Property's roof was actually repaired or replaced. The Policy includes no language suggesting that the obligation to first repair or replace is excused where a coverage dispute exists. Here, the Church points to nothing in the evidentiary record indicting that it has repaired the exterior roof. Thus, no genuine dispute of fact exists and GuideOne is entitled to summary judgment with respect to this issue.

B.       *Breach of the Duty of Good Faith and Fair Dealing Claim*

Under Oklahoma law, "an insurer has an implied duty to deal fairly and act in good faith with its insured and . . . the violation of this duty gives rise to an action in tort." *Christian v. Am. Home Assurance Co.,* 577 P.2d 899, 904 (Okla. 1977). The essential elements of a bad faith claim are as follows: "(1) claimant was entitled to coverage under the insurance policy at issue; (2) the insurer had no reasonable basis for delaying payment; (3) the insurer did not deal fairly and in good faith with the claimant; and (4) the insurer's violation of its duty of good faith and fair dealing was the direct cause of the claimant's injury." *Ball v. Wilshire Ins. Co.*, 221 P.3d 717, 724 (Okla. 2009). Tort liability requires more than mere negligence. *Badillo v. Mid Century Ins. Co.*, 121 P.3d 1080, 1094 (Okla. 2005). "A central issue in any analysis to determine whether breach has occurred is gauging whether the insurer had a good faith belief in some justifiable reason for the

actions it took or omitted to take that are claimed violative of the duty of good faith and fair dealing." *Id.* at 1093-94. "[B]ad faith cannot exist if an insurer's conduct was reasonable under the circumstances." *Barnes v. Okla. Farm Bureau Mut. Ins. Co.*, 11 P.3d 162, 170-71 (Okla. 2000); *see also Shotts v. GEICO Gen. Ins. Co.*, 943 F.3d 1304, 1314 (10th Cir. 2019) ("To succeed on a bad faith claim, 'the insured must present evidence from which a reasonable jury could conclude that the insurer did not have a reasonable good faith belief for withholding payment of the insured's claim.'"). The insurer's conduct must be assessed based on the facts known and knowable to the insurer concerning the claim at the time the insurer's performance was requested. *Buzzard v. McDanel*, 736 P.2d 157, 159 (Okla. 1987); *see also Oulds v. Principal Mut. Life Ins. Co.*, 6 F.3d 1431, 1439 (10th Cir. 1993).

"The mere allegation that an insurer breached the duty of good faith and fair dealing does not automatically entitle a litigant to submit the issue to a jury for determination." *Oulds,* 6 F.3d at 1436. "Until the facts, when construed most favorably against the insurer, have established what might reasonably be perceived as tortious conduct on the part of the insurer, the legal gate to submission of the issue to the jury remains closed." *Id.* at 1437.

For the reasons discussed above, a genuine dispute of fact exists as to coverage for the Church's claim under the Policy. GuideOne argues that the existence of the dispute precludes bad faith liability. However, the Tenth Circuit, applying Oklahoma law, has recognized that "a legitimate dispute as to coverage will not act as an impenetrable shield against a valid claim of bad faith." *Timberlake Constr. Co. v. U.S. Fid. & Guar. Co.*, 71 F.3d 335, 343 (10th Cir. 1995). Rather, even where a legitimate dispute exists, a jury must still determine the existence of bad faith when the insured "produce[s] additional evidence of bad faith." *Bannister v. State Farm Mut. Auto. Ins. Co.*, 692 F.3d 1117, 1128 (10th Cir. 2012) (quoting *Timberlake,* 71 F.3d at 344); *see*

*also Shotts*, 943 F.3d at 1315.  The Tenth Circuit has recognized that the additional evidence may take several forms, including "evidence that the insurer did not *actually* rely on th[e] legitimate [dispute] to deny coverage, denied the claim for an illegitimate reason, or otherwise failed to treat the insured fairly."  *Shotts*, 943 F.3d at 1315 (internal quotations and citations omitted) (emphasis in original).

Additional evidence of bad faith may also include evidence "that the insurer performed an inadequate investigation of the claim."  *See Shotts*, 943 F.3d at 1315; *Bannister,* 692 F.3d at 1128 (quoting *Timberlake Constr. Co*., 71 F.3d at 345) ("Another instance in which the jury may decide the issue is if there is evidence that the insurer 'failed to adequately investigate [the] claim.'").  Here, the Church asserts that GuideOne conducted an unreasonable investigation.  Pursuant to Oklahoma law, "the insurer must conduct an investigation reasonably appropriate under the circumstances."  *Buzzard v. Famers Ins. Co., Inc.,* 824 P.2d 1105, 1109 (Okla. 1991).  "[W]hen a bad faith claim is premised on inadequate investigation, the insured must make a showing that material facts were overlooked or that a more thorough investigation would have produced relevant information."  *Timberlake Constr. Co*., 71 F.3d at 345.

Here, the Church presents evidence that, on April 27, 2018, Dufrenne obtained a Verisk Hail Report that identified "[s]everal events in 2017 in this area," [Doc. 38-3, p. 9], and Williams noted that the area experience 0.8 inch hail on April 4, 2017, an additional date within the Policy's coverage not disclosed in the Verisk Report.  [Doc. 38-5, p. 6].  Further, on April 19, 2018, the date the claim was reported, adjuster Dufrenne obtained a Property/Casualty Claims History that identified a December 21, 2015 claim made by the Church under a policy issued by Farmers Insurance Exchange for windstorm and hail damage at the Property.  [Doc. 40-7].  However, Dufrenne never requested information regarding the 2015 claim.  The Farmers claim file included

photographs of the Sanctuary roof taken on December 22, 2015.  [Doc. 40-10].  The HEART Claim Pics identified wind damage, as well as wear and tear to flashing and the shingles, but included no indication of hail damage.  [*Id.*].

Despite knowledge of a 2015 claim and potential dates of loss in 2017, it is undisputed that Dufrenne relied on the Williams engineering report to conclude that the damage occurred prior to the Policy's inception—specifically suggested dates of July 4, 2013, May 22, 2011, and April 23, 2011.  Dufrenne denied coverage based on the Williams report.  [Doc. 38, pp. 8-9, ¶ 6; Doc. 40, p. 6, ¶ 6; Doc. 38-6].  Had Dufrenne conducted additional investigation and obtained information regarding the December 21, 2015 claim, he may have discovered relevant evidence that the roof showed no obvious signs of hail damage in late 2015, at least two years after the dates of loss identified by Dufrenne in the denial letter.

Additionally, the Church points to evidence that, on September 25, 2018, GuideOne received correspondence from Kurt Gariss on behalf of the Church.  The correspondence set forth the Church's criticisms of the Williams report, including that a pre-policy inspection indicated that the roof was in insurable condition and, further, that Williams' photographs and observations were inconsistent with hail any larger than 1" and therefore the bruises appear to correspond most closely with the April 4, 2017 hail event.  [Doc. 38-8, pp. 3-4].  In the correspondence, the Church specifically requested that GuideOne reconsider its coverage determination.  [Doc. 38-8, p. 5]. Based on the evidentiary record submitted, GuideOne conducted no additional investigation as a result of the September 25, 2018 correspondence.   [Doc. 38-3, p. 4].   Rather, the next day, Dufrenne sent the Church correspondence referring the insured to the Policy's Appraisal Clause. [Doc. 38-10].  However, under Oklahoma law (as well as the Policy's plain language), an appraisal provision relates only to the *amount* of loss and "has no bearing on coverage, causation, or other

elements of liability." *Hayes Fam. Tr. v. State Farm Fire & Cas. Co.*, 845 F.3d 997, 1006 (10th Cir. 2017).

At the time Dufrenne referred the Church to the Appraisal Clause, GuideOne had wholly denied coverage and the Appraisal Clause therefore had no bearing on plaintiff's claim. Further, based on the evidence submitted, a reasonable juror could conclude that GuideOne conducted no additional investigation after receiving Gariss's letter, which identified inconsistencies in Williams' observations and conclusions and suggested that the hail bruises most closely corresponded with the April 4, 2017 hail event. [Doc. 38-11, p. 6]. The Church submits evidence that April 4, 2017 is now accepted as the date of loss. *See* [Doc. 40-2].

Viewing the evidence in the light most favorable to the Church, for the foregoing reasons, the Church submits evidence that that GuideOne overlooked material facts in its investigation or that a more thorough investigation would have produced relevant information. Thus, a genuine dispute exists as to the adequacy of GuideOne's investigation, and a jury must determine the existence of bad faith. GuideOne's motion for summary judgment as to the Church's breach of the implied duty of good faith and fair dealing is denied.

C.     *Punitive Damages*

Finally, GuideOne argues it is entitled to summary judgment as to the Church's request for punitive damages because the Church cannot establish that GuideOne recklessly disregarded its duty of good faith and fair dealing to the Church.

Under Oklahoma law, an award of punitive damages is appropriate where the jury finds by clear and convincing evidence that "[a]n insurer has recklessly disregarded its duty to deal fairly and act in good faith with its insured" or "intentionally and with malice breached its duty to deal

fairly and act in good faith with its insured." Okla. Stat. tit. 23, § 9.1(B)(2), (C)(2).[7]  If the jury

finds that the insurer acted with "reckless disregard," the jury, in a separate proceeding conducted

after the jury has made such finding and awarded actual damages, may award damages in an

amount not to exceed the greater of:  (a) one hundred thousand dollars ($100,000.00), or (b) the

amount of the actual damages awarded.  Okla. Stat. tit. 23, § 9.1(B)(2).  Alternatively, if the jury

finds that the insurer acted intentionally and with malice, the jury, in a separate proceeding after

the award of actual damages, the jury may award punitive damages in an amount not to exceed the

greatest of:  (a) five hundred thousand dollars ($500,000.00), (b) twice the amount of actual

damages awarded, or (c) the increased financial benefit derived by the insurer as a direct result of

the conduct causing the injury to the plaintiff and other persons or entities.  Okla. Stat. tit. 23, §

9.1(C)(2).  However, as recognized by the Oklahoma Supreme Court

> Although the current punitive damage statute contains language specifically
> referencing insurers when they are sued for breach of the duty of good faith and fair
> dealing, our recognition in *Buzzard* that such an award is not automatic and is
> governed by the standard applicable in other tort cases still stands and nothing in §
> 9.1 has altered this principle.  Under § 9.1, for punitive damages to be allowed there
> **must** be evidence, **at a minimum**, of reckless disregard toward another's rights
> from which malice and evil intent may be inferred.

*Badillo,* 121 P.3d at 1106 (emphasis in original).

Viewing the summary judgment record in the light most favorable to the Church and

drawing all reasonable inferences in the Church's favor, a genuine issue of fact exists as to whether

GuideOne, at a minimum, recklessly disregarded its duty of good faith and fair dealing with respect

to its investigation and payment of plaintiff's claim.  Summary adjudication of the punitive

damages issue is therefore not warranted at this time.

---

[7] The Church does not argue that GuideOne "engaged in conduct life-threatening to humans."  *See*
Okla. Stat. tit. 23, § 9.1(D)(2).

### IV.    Conclusion

WHEREFORE, the Motion for Summary Judgment [Doc. 38] of defendant GuideOne Mutual Insurance Company is granted in part, denied in part, and moot in part.  The motion is granted as to plaintiff Garnett Road Baptist Church's breach of contract claim to the extent premised on failure to pay depreciation and failure to pay for water intrusion, if any, to the Hmong Church Building.  The motion is moot insofar as it seeks judgment for breach of contract premised on failure to pay sales tax.  The motion is otherwise denied.

DATED this 30th day of October, 2020.

GREGORY K. FRIZZELL
UNITED STATES DISTRICT JUDGE